## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

THE AMERICAN DENTAL ASSOCIATION, in an associational capacity on behalf of its members, and JOHN MILGRAM, D.D.S., and SCOTT A TRAPP, D.D.S, individually and on behalf of all others similarly situated,

|  |  |
|---|---|
|  | Case No.: 03-21266-CIV-JORDAN |
|  | Magistrate Judge Turnoff |

Plaintiffs,

v.

CIGNA CORPORATION, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA DENTAL HEALTH, INC.,  METLIFE, INC., METROPOLITAN LIFE INSURANCE COMPANY, and MUTUAL OF OMAHA INSURANCE COMPANY,

Defendants.



## PLAINTIFFS' MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.      THE STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     THE ADA HAS STANDING TO BRING THIS
        ACTION ON BEHALF OF ITS MEMBERS  . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    THE MCCARRAN-FERGUSON ACT DOES
        NOT BAR PLAINTIFFS' RICO CLAIMS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Because the Relationship between an
                Insurance Company and Providers Falls
                Outside the Business of Insurance,
                McCarran-Ferguson is Not Applicable  . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      The Insurance Laws of the States in Which
                The Individual Plaintiffs Reside are Not
                Inconsistent with their RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.  Illinois Allows Private Actions for
                    Insurer Misconduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                2.  Nebraska Permits Private Actions
                    For Tortious Acts by Insurance Companies . . . . . . . . . . . . . . . . . . 15

IV.     PLAINTIFFS HAVE ADEQUATELY PLED
        VIOLATIONS OF RICO IN COUNTS I-IV
        OF THE COMPLAINT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.      Plaintiffs' Properly Allege a Managed
                Care "Enterprise" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.      Plaintiffs Properly Plead "Direction" and
                "Control" Under Section 1962(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.      Plaintiffs Have Adequately Pled Mail and
        Wire Fraud as Predicate Acts for Their
        RICO Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.      Plaintiffs Have Adequately Alleged Violations
        of the Hobbes Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.      Plaintiffs Have Adequately Alleged a RICO
        Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

F.      Plaintiffs' § 1962(a) Allegations State a
        Cognizable Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

V.      PLAINTIFFS' CLAIMS FOR AIDING AND
        ABETTING VIOLATIONS OF RICO SHOULD
        BE SUSTAINED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI.     PLAINTIFFS HAVE STATED A CLAIM FOR
        INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VII.    PLAINTIFFS' STATE LAW CLAIMS ARE
        NOT PREEMPTED BY ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VIII.   PLAINTIFFS' CLAIMS FOR CONSTRUCTIVE
        CONTRACT AND UNJUST ENRICHMENT ARE
        NOT PRECLUDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IX.     PLAINTIFFS ADEQUATELY ALLEGE CLAIMS
        UNDER STATE PROMPT-PAY PROVISIONS . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Action Alliance of Senior Citizens v. Snider*,
    1994 U.S. Dist. LEXIS 10034 (E.D. Pa. July 18, 1994) ......................................................... 8

*American Med. Ass'n v. United Healthcare Corp.*,
    2002 U.S. Dist. LEXIS 20309 (Oct. 22, 2002) ........................................................ 7

*American Med. Ass'n v. United Healthcare Corp.*,
    2003 U.S. Dist. LEXIS 14686 (S.D.N.Y. Aug. 22, 2003) ...................................................... 7

*Avirgan v. Hull*,
    932 F.2d 1572 (11th Cir. 1991), *cert. denied*,
    506 U.S. 952 (1992) ................................................................................. 18, 34, 35

*Bancoklahoma Mortg. Corp. v. Capital Title Corp.*,
    194 F.3d 1089 (10th Cir. 1999) ............................................................................. 12, 13

*Billings v. Continental Cas. Co.*,
    2003 U.S. Dist. LEXIS 796 (N.D. Ill. Jan. 15, 2003) .......................................................... 45

*Braunstein v. General Life Ins. Co.*,
    2002 U.S. Dist. LEXIS 24853 (S.D. Fla. Nov. 18, 2002) ..................................................... 16

*Busby v. Crown Supply, Inc.*,
    896 F.2d 833 (4th Cir. 1990) ........................................................................... 34, 35

*Byrd v. Mac-Papers*,
    961 F.2d 157 (11th Cir. 1992) ................................................................................ 43

*CBS, Inc. v. Primetime 24 Joint Venture*,
    245 F.3d 1217 (11th Cir. 2001) .............................................................................. 41

*Carlstead v. Holiday Inns, Inc.*,
    1986 U.S. Dist. LEXIS 19302 (N.D. Ill. Oct. 9, 1986) ........................................................ 33

*Castle v. Cohen*,
    676 F. Supp. 620 (E.D. Pa. 1987), *aff'd in part and*
    *remanded in part on other grounds*, 840 F.2d 173 (3d Cir. 1988) ...................................... 29

*Central Bank of Denver, N.A. v.*
  *First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ............................................................................................... 36, 37

*Chambers Dev. Co. v. Browning Ferris Indus.,*
  590 F. Supp. 1528 (W.D. Pa. 1984) ...................................................................... 41

*Cheney v. Cyberguard Corp.,*
  2000 U.S. Dist. LEXIS 16351 (S.D. Fla. July 31, 2000) ...................................... 5

*Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.,*
  814 F. Supp. 1084 (S.D. Fla. 1992) ...................................................................... 34

*Commonwealth Ins. Co. v. Store Container Corp,*
  2001 U.S. Dist. LEXIS 11100 (N.D. Ill. May 3, 2001) .................................... 4, 15

*Conley v. Gibson,*
  355 U.S. 41 (1957) ................................................................................................. 4

*Cort v. Ash,*
  422 U.S. 66 (1975) ............................................................................................... 47

*Cox v. Administrator U.S. Steel & Carnegie,*
  17 F.3d 1386 (11th Cir.), *modified on other grounds,*
  *reh'g denied,* 30 F.3d 1347 (11th Cir. 1994),
  *cert. denied sub nom.,* 513 U.S. 1110 (1995) ............................................... 36, 37

*Crowe v. Henry,*
  43 F.3d 198 (5th Cir. 1995) ................................................................................. 35

*Dehoyos v. Allstate Corp.,*
  345 F.3d 290 (5th Cir. 2003) ............................................................................... 12

*Forest Travel Agency, Inc. v. Duvall,*
  1988 U.S. Dist. LEXIS 1541 (N.D. Ill. Feb. 19, 1988) ...................................... 32

*Franklin v. Gwinnett County Pub. Sch.,*
  503 U.S. 60 (1992) ............................................................................................... 40

*In re Fredeman Litig.,*
  843 F.2d 821 (5th Cir. 1988) ............................................................................... 41

*Genty v. Resolution Trust Corp.,*
  937 F.2d 899 (3d Cir. 1991) ................................................................................ 35

*Grider v. Keystone Health Plan Central, Inc.*,
  2003 U.S. Dist. LEXIS 16551 (E.D. Pa. Sept. 18, 2003) ............................................ *passim*

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
  440 U.S. 205 (1979) ................................................................................................ 9, 10

*Haroco, Inc. v. American Nat'l Bank and Trust Co.*,
  747 F.2d 384 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985) ................................ 35, 36

*Harrison v. United Mine Workers 1974 Ben. Plan & Trust*,
  941 F.2d 1190 (11th Cir. 1991) ............................................................................... 43

*Hospice of Metro Denver, Inc. v. Group Health Ins.*,
  944 F.2d 752 (10th Cir. 1991) ................................................................................. 42

*Hospital Council of Western Pa. v. Pittsburgh*,
  949 F.2d 83 (3d Cir. 1991) ......................................................................................... 8

*Humana, Inc. v. Forsyth*,
  525 U.S. 299 (1999) ......................................................................... 4, 11, 12, 13

*Hunt v. Washington State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ............................................................................................... 5, 6

*Industrial Enclosure Corp. v. Northern Ins. Corp.*,
  1998 U.S. Dist. LEXIS 19453 (N.D. Ill. Nov. 30, 1998) ........................................ 14

*International Union, United Auto. Workers v. Brock*,
  477 U.S. 274 (1988) .................................................................................................. 7

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
  926 F.2d 1406 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991) ............................... 25

*Lakeland Anesthesia, Inc. v.*
*Louisiana Health Service & Indem. Co.*,
  2000 U.S. Dist. LEXIS 18626 (E.D. La. Dec. 6, 2000) ....................................... 42

*Langendorf v. Travelers State Ins. Co.*,
  625 F. Supp. 1103 (N.D. Ill. 1985) ....................................................................... 15

*Langford v. Rite Aid of Ala., Inc.*,
  231 F.3d 1308 (11th Cir. 2000) .......................................................................... 24, 25

*Lordmann Enters., Inc. v. Equicor*,
  32 F.3d 1529 (11th Cir. 1994), *cert. denied*, 516 U.S. 930 (1995) .................... 5, 42

-v-

*In re Managed Care Litig.*,
    135 F. Supp. 2d 1253 (S.D. Fla. 2001),
    150 F. Supp. 2d 1330 (S.D. Fla. 2001)
    185 F. Supp. 2d 1310 (S.D. Fla. 2002) ........................................................ *passim*

*Manning v. Valor Ins.*,
    1999 U.S. Dist. LEXIS 4577 (N.D. Ill. March 25, 1999) .................................... 14

*Marshall Field & Co. v. Icahn*,
    537 F. Supp. 413 (S.D.N.Y. 1982) ........................................................................ 41

*Masi v. Ford City Bank & Trust*,
    779 F.2d 397 (7th Cir. 1986) .............................................................................. 34

*Mason v. Continental Group*,
    763 F.2d 1219 (11th Cir. 1985), *cert. denied*,
    474 U.S. 1097 (1986) ........................................................................................ 43

*Mesocap Indus. v. Torm Lines*,
    194 F.3d 1342 (11th Cir. 1999) ............................................................................ 5

*Miles v. Tennessee River Pulp and Paper Co.*,
    862 F.2d 1525 (11th Cir. 1989) .......................................................................... 44

*Moore v. Liberty Nat'l Life Ins. Co.*,
    267 F.3d 1209 (11th Cir. 2001), *cert. denied*,
    535 U.S. 1018 (2002) .................................................................................. 12, 13

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002),
    *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003) ...................................... 41

*National Alcoholism Programs/Cooper City, Inc.*
    *v. Palm Springs Hosp. Employee Benefit Plan*,
    825 F. Supp. 299 (S.D. Fla. 1993) ........................................................................ 5

*National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2nd Cir. 1988) .............................................................................. 8

*National Org. for Women, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*,
    537 U.S. 393 (2003) .................................................................................. 39, 40

*New York State Nat'l Org. of Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989) ................................................................... 7

*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3d Cir. 2002) ...................................................................... 7

*Perrino v. Southern Bell Tel. & Tel. Co.*,
209 F.3d 1309 (11th Cir. 2000) .............................................................. 43

*Pritt v. Blue Cross & Blue Shield*,
699 F. Supp. 81 (S.D. W. Va. 1988) ....................................................... 10

*Religious Tech Ctr. v. Wollersheim*,
796 F.2d 1076 (9th Cir. 1986), *cert. denied*, 479 U.S. 1103 (1987) ...................................... 40

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
119 F.3d 935 (11th Cir. 1997) ................................................................ 31

*Retired Chicago Police Ass'n v. Chicago*,
7 F.3d 584 (7th Cir. 1993) ........................................................................ 8

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ................................................................................ 21

*S & Davis Int'l, Inc. v. Yemen*,
218 F.3d 1292 (11th Cir. 2000) ................................................................ 5

*Sabo v. Metropolitan Life Ins. Co.*,
137 F.3d 185 (3d Cir. 1998), *cert. denied*, 525 U.S. 1129 (1999) ...................................... 14

*In re Sahlen & Assocs., Inc. Sec. Litig.*,
773 F. Supp. 342 (S.D. Fla. 1991) .......................................................... 34

*Scheidler v. National Org. for Women, Inc.*,
537 U.S. 393 (2003) ................................................................. 3, 27, 28

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) .................................................................................. 5

*Springer v. Wal-Mart Assocs. Group Health Plan*,
908 F.2d 897 (11th Cir. 1990) ................................................................ 43

*St. Bernard Hosp. v. Hospital Serv. Ass'n*,
618 F.2d 1140 (5th Cir. 1980) ................................................................ 10

*Thunderwave, Inc. v. Carnival Corporation,*
   954 F. Supp. 1562 (S.D. Fla. 1997) ............................................................ 44

*Trane Co. v. O'Connor Sec.,*
   718 F.2d 26 (2d Cir. 1983) ...................................................................... 41

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
   444 U.S. 11 (1979) ................................................................................ 45

*Union Labor Life Ins. Co. v. Pireno,*
   458 U.S. 119 (1982) .............................................................................. 10

*United States v. Castro,*
   89 F.3d 1443 (11th Cir. 1996), *cert. denied,*
   519 U.S. 1118 (1997) ............................................................................ 30

*United States v. Cochran,*
   109 F.3d 660 (10th Cir. 1997) ................................................................ 25

*United States v. Goldin Indus.,* 219 F.3d 1271 (11th Cir. 2000),
   *cert. denied,* 531 U.S. 1015 (2000) ........................................................ 17

*United States v. Harriston,*
   329 F.3d 779 (11th Cir. 2003) ......................................................... 30, 36

*United States v. Keplinger,*
   776 F.2d 678 (7th Cir. 1985), *cert. denied,*
   476 U.S. 1183 (1986) ............................................................................ 25

*United States v. Local 30,*
   871 F.2d 401 (3d Cir.), *cert. denied,* 493 U.S. 953 (1989) ..................... 39

*United States v. Majors,*
   196 F.3d 1206 (11th Cir. 1999), *cert. denied,* 529 U.S. 1137 (2000) ..................... 31

*United States v. Turkette,*
   425 U.S. 576 (1981) .............................................................................. 18

*Vietnamese Fisherman's Ass'n v. Knights of Ku Klux Klan,*
   518 F. Supp. 993 (S.D. Tex. 1981) ......................................................... 41

*Wineinger v. United Healthcare Ins. Co.,*
   2000 U.S. Dist. LEXIS 1849 (D. Neb. Feb. 16, 2000) ............................ 15

*Ziemba v. Cascade Int'l Inc.*,
256 F.3d 1194 (11th Cir. 2001) ........................................................ 36

## STATE CASES

*American Serv. Ins. Co. v. Passarelli*,
752 N.E.2d 635 (Ill. App. 2001) ....................................................... 15

*Cramer v. Insurance Exch. Agency*,
675 N.E.2d 897 (Ill. 1996) ....................................................... 14, 15

*Ford Motor Credit Co. v. Manzo*,
554 N.E.2d 480 (Ill. App. 1990) ....................................................... 45

*H.J. Tucker & Assocs., Inc. v. Allied Chucker and Engineering Co.*,
595 N.W.2d 176 (Mich. App. Ct. 1999),
*appeal denied*, 607 N.W.2d 722 (Mich. 2000) ................................... 44

*Kirwan v. Chicago Title Ins. Co.*,
612 N.W.2d 515 (2000), *aff'd in part and rev'd in part
on other grounds*, 624 N.W.2d 644 (2001) ....................................... 16

*Kuntzelman v. Avco Fin. Servs.*,
291 N.W.2d 705 (Neb. 1980) ....................................................... 16

*Luscher v. Empkey*,
293 N.W.2d 866 (Sup. Ct. Neb. 1080) ............................................ 15

## FEDERAL STATUTES AND RULES

15 U.S.C. §§ 1011-1015 (McCarran-Ferguson Act) ................................. 9

18 U.S.C. § 1952(a) (Travel Act) ....................................................... 26

18 U.S.C. §§ 1961 - 1968 (Racketeer Influenced and
Corrupt Organizations Act ("RICO")) ........................................... *passim*

28 U.S.C. § 2201 ....................................................................... 37

42 U.S.C. §§ 1981 and 1982 (Civil Rights Act) ................................... 13

Fed. R. Civ. P. 8(a) ................................................................... 23

Fed. R. Civ. P. 8(e)(2) ......................................................... 23, 44, 45

Fed. R. Civ. P. 9(b) ............................................................................................... 23


## STATE STATUTES

215 Ill. Comp. Stat. 5/154.5-.6
(Illinois Improper Claims Practices Act) ...................................................... 14, 15, 45

215 Ill. Comp. Stat. 5/155 ................................................................................. 15, 45

215 Ill. Comp. Stat. 5/357.9 .................................................................................. 45

215 Ill. Comp. Stat. 5/368a
(Timely Payment for Health Care Services) ............................................................ 46

815 Ill. Comp. Stat. 505 (Illinois Consumer
Fraud and Deceptive Business Practices Act) ..................................................... 14, 15

Neb. Stat. §§ 44-1521 to -1535 (Nebraska Unfair
Insurance Trade  Practices Act) ............................................................................ 16

Neb. Stat. § 44-1540(3)-(4) (Nebraska Unfair
Claim Settlement Practices Act) ..................................................................... 15, 46

Neb. Stat. §§ 59-1601 to -1622 (Nebraska Consumer
Protection Act) .................................................................................................. 16

Plaintiffs The American Dental Association ("ADA"), John Milgram, D.D.S., and Scott A. Trapp, D.D.S. (the "Individual Plaintiffs" and, collectively with the ADA, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' joint motion to dismiss.[1]

## PRELIMINARY STATEMENT

On May 19, 2003, Plaintiffs filed a complaint against a number of dental insurance companies alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law claims including breach of contract and violations of state prompt-pay statutes. Compl. ¶ 1. The ADA brings this action in a representational capacity on behalf of its members, and Drs. Milgram and Trapp bring this action on behalf of a putative class of dentists who have entered into contractual relationships with Defendants whereby the dentists have agreed to accept discounted fees for providing dental services to subscribers to health care plans offered or administered by Defendants ("in-network" providers). Compl. ¶ 14. Plaintiffs allege that Defendants have collusively enforced internal policies and procedures designed to reduce the reimbursements to their in-network dentists below the level to which they are entitled under their contracts, by, *inter alia*, "changing the code assigned to a particular service to a less expensive CDT code,"[2] or "downcoding," and "combining the codes of two or more appropriately performed and billed procedures into one billed procedure," or "bundling." *Id.* ¶¶ 31-32. In so doing, Plaintiffs allege that

---

[1] The Defendants are CIGNA Corporation, Connecticut General Life Insurance Company, CIGNA Dental Health, Inc., MetLife, Inc., Metropolitan Life Insurance Company, and Mutual of Omaha Insurance Company ("Defendants").

[2] In 1986, the Council on Dental Benefit Programs created an educational manual to include the *Code on Dental Procedures and Nomenclature* (the "Code"). *Current Dental Terminology, Fourth Edition* ("CDT-4") contains the most recent revisions to the Code. The Code, which is designed as the national standard for reporting dental services by the Federal Government under the Health Insurance and Portability and Accountability Act of 1996 ("HIPAA"), is currently recognized by third-party payers nationwide as the proper means by which dentists can identify and bill for providing dental health care services. Compl. ¶ 23.

Defendants have used fraudulent tactics to violate the terms and conditions of their in-network dental contracts.

Defendants move to dismiss the Complaint, contending that Plaintiffs' RICO claims should be dismissed for many of the same reasons that Judge Moreno dismissed RICO claims in *In re Managed Care Litig.*, 135 F. Supp. 2d 1253 (S.D. Fla. 2001). This argument is disingenuous because Defendants *fail* to advise the Court that a year later many of the same RICO claims, made by subscribers, were *sustained* in substantial part by Judge Moreno. *In re Managed Care Litig.*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002).[3] As a result, *In re Managed Care Litigation* strongly supports the viability of Plaintiffs RICO and state-law claims. In addition, in *Grider v. Keystone Health Plan Central, Inc.*, 2003 U.S. Dist. LEXIS 16551 (E.D. Pa. Sept. 18, 2003), which also entailed claims against insurance companies for fraudulent downcoding, bundling and related manipulations of medical codes, the court sustained virtually all of the RICO and common law counts based on allegations virtually identical to those made in this action.

Defendants' challenge to the ADA's representative standing must fail. The ADA brings this action to represent its members in an effort to alleviate Defendants' continuing misconduct. Because the ADA challenges systemic practices that can easily be proved through Defendants' own documentation, there is no need for participation of individual ADA members to prove its claims. As a result, the ADA is a proper party to the action and may seek appropriate relief.

Moreover, all of Plaintiffs' RICO-related claims should be upheld. The allegations of mail and wire fraud as RICO predicate acts are amply supported by the Complaint's identification

---

[3] CIGNA is a defendant in *In re Managed Care Litigation*, and retained the same counsel in the present action.

2

of numerous specific communications from Defendants to Plaintiffs -- most prominently Defendants'

Explanation of Benefits Statements ("EOBs") -- which misrepresented and concealed the true nature

of and reasons for Defendants' claim decisions.  Plaintiffs' allegations of extortion also serve as an

additional predicate act under *Scheidler v. National Org. for Women, Inc.*, 537 U.S. 393 (2003),

based on allegations that Defendants exploited their economic power and market dominance to

coerce Plaintiffs into surrendering legitimately earned dental fees that Defendants unjustly retained.

Defendants' attack on the RICO enterprise set forth in the Complaint is equally baseless,

since Plaintiffs have in great detail identified a tightly-knit network of Defendant insurance

companies and their third party vendors -- those who develop and implement the systems utilized

by defendants -- that act as a "functioning unit" and for the "common purpose" of artificially

reducing and denying dental provider payments to the Plaintiff Class.  Indeed, virtually identical

allegations of RICO enterprises were sustained by the court in *In re Managed Care Litig.*, 185 F.

Supp. 2d 1310, 1323-24 (S.D. Fla. 2002), and *Grider*, 2003 U.S. Dist. LEXIS 16551, at *66-*69.

Similarly, the assertion that Plaintiffs have not adequately alleged defendants'

"direction," "control" or "operation" of the enterprise, within the meaning of § 1962(c), is without

basis.  The Complaint specifically avers that Defendants orchestrated the fraudulent scheme by

engaging and paying third parties to develop and implement the automatic systems for manipulating

the claims submitted by Plaintiffs.  Clearly, Defendants are "poised at the apex of the network," *see*

*In re Managed Care Litig.*, 185 F. Supp. 2d at 1324, which functions to systematically deny, reduce

and delay payments to dental providers.  At the same time, Plaintiffs have easily satisfied the

pleading requirements of § 1962(a), by alleging both injuries flowing from the predicate acts and

injuries resulting from Defendants' investment of income in the enterprise.  Plaintiffs also meet the

3

pleading requirements for conspiracy and aiding and abetting liability under RICO.

In addition, claims for injunctive relief may be asserted under RICO. There can be no doubt that Plaintiffs have met the standards for such relief, in light of the allegations that Defendants' fraudulent claims practices pose an ongoing threat of irreparable harm to Plaintiffs.

Furthermore, Defendants' contention that the RICO claims are barred by the McCarran-Ferguson Act is firmly rebutted by the Supreme Court decision in *Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999), which Defendants patently misread. *Humana* firmly establishes that, where the relevant state laws -- including common law -- allow claims against insurers for fraud or related misconduct, RICO actions do not conflict with, but complement, state insurance regulatory schemes.

Nor does Defendants' contention that ERISA preempts Plaintiffs' state law claims have any legal basis. The Eleventh Circuit, in *Lordmann Enters., Inc. v. Equicor*, 32 F.3d 1529 (11th Cir. 1994), *cert. denied*, 516 U.S. 930 (1995), specifically held that claims by medical providers who seek to enforce their in-network contracts do not "relate to" or require "reference to" ERISA plans, and are therefore not preempted by ERISA.

Finally, Defendants have not established any defects in the other state law claims for constructive contract/unjust enrichment or violation of state prompt pay statutes. Consequently, Defendants' motions to dismiss these claims should be denied.

## **ARGUMENT**

### I.    **THE STANDARD OF REVIEW**

The Court should grant a motion to dismiss only if the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41 (1957). The Court must view the complaint in the light most favorable to the plaintiff and accept the facts alleged as true. *Scheuer*

4

*v. Rhodes*, 416 U.S. 232 (1974);  *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000); *National Alcoholism Programs/Cooper City, Inc. v. Palm Springs Hosp. Employee Benefit Plan*, 825 F. Supp. 299, 301 (S.D. Fla. 1993).  Moreover, a court must not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle[] [him] to relief." *National Alcoholism Programs*, 825 F. Supp. at 301; *see also Mesocap Indus. v. Torm Lines*, 194 F.3d 1342, 1343 (11th Cir. 1999); *Cheney v. Cyberguard Corp.*, 2000 U.S. Dist. LEXIS 16351 (S.D. Fla. July 31, 2000) (citing *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984)).

As set forth below, Defendants have failed to make the type of showing to warrant dismissal with respect to any of Plaintiffs' claims.

## II.   THE ADA HAS STANDING TO BRING THIS ACTION ON BEHALF OF ITS MEMBERS

Defendants' challenge to the associational standing of the ADA to bring this action on behalf of its members flies directly in the face of well-established Supreme Court precedent, which permits associations in positions such as the ADA to seek declaratory and injunctive relief on behalf of their members.

Under the three-prong test set forth in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), the ADA has standing to bring claims on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit."[4]   These requirements have been met here.

Defendants do not contest the fact that the ADA satisfies the first two prongs of the *Hunt* test, in that the ADA's members who have contracts with any of the Defendants have standing in their own right to pursue relief for breach of contract and other claims as alleged in the Complaint, and the interests Plaintiffs seek to protect in this lawsuit are clearly germane to the purposes of the ADA. *See* Compl. ¶ 8. Moreover, the third and final prong of the test is satisfied because the lawsuit challenges Defendants' internal procedures for determining reimbursement levels for dental services and other related issues, and the ADA seeks injunctive and declaratory relief, not damages, such that the participation of its members is not required.

Defendants' sole challenge to the ADA's standing is based on their assertion that ADA members must participate individually in the adjudication of the merits of the case. This argument is baseless. Plaintiffs' claims are not based on individual challenges to specific claims for reimbursement which might require the Court to evaluate each individual claim. Rather, Plaintiffs are challenging the validity of the underlying policies and procedures used by Defendants to reduce reimbursements, such as bundling and downcoding. To the extent Plaintiffs can prove that these policies are inherently improper and represent a breach of Defendants' in-network contracts, such

---

[4] In *Hunt*, the Court noted that "the interests of the Commission itself may be adversely affected by the outcome of this litigation," insofar as defendants' actions "could reduce the amount of the assessments due the Commission and used to support its activities," adding that "[t]his financial nexus between the interests of the Commission and its constituents coalesces with the other factors noted above to 'assure that concrete adverseness which sharpens the presentation of issues . . . .'" 432 U.S. at 345 (citations omitted). Similarly, Defendants' alleged activities depriving dentists of fees would likely, as in *Hunt*, also reduce the amount of dues or assessments that the ADA utilizes to support and expand its activities, thus conferring an additional basis for the standing of the ADA.

6

a finding will apply to *all* of Defendants' reimbursement decisions, without requiring individual assessments or the individual participation of members of the dental providers.

The ADA seeks injunctive and declaratory relief. As the United States Supreme Court has held, individual participation of an association's membership may be unnecessary where the relief sought is prospective. *International Union, United Auto. Workers v. Brock*, 477 U.S. 274, 287 (1988). In a closely analogous situation, the Third Circuit in *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002), upheld  the standing of a medical society under the third prong of *Hunt*. In *The American Med. Ass'n v. United Healthcare Corp.*, 2002 U.S. Dist. LEXIS 20309 (Oct. 22, 2002), the court upheld the associational standing of the American Medical Association and two other medical societies in a challenge based on the purported necessity of individual participation of their members. In *The American Med. Ass'n v. United Healthcare Corp.*, 2003 U.S. Dist. LEXIS 14686 (S.D.N.Y. Aug. 22, 2003), the court upheld associational standing of four unions who sought to intervene on behalf of their members. *See also New York State Nat'l Org. of Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989).

As here, the Society's complaint in *Green Spring* challenged "the methods the [managed care organizations (MCOs)] employ for making decisions – *e.g.,* authorizing or denying mental health services, credentialing physicians, and reimbursements," and "involve[d] systemic policy violations that will make extensive individual participation unnecessary." 280 F.3d at 286. Hence, there, as in this case:

> insofar as its allegations concern how the MCOs render these decisions, the Society's complaint "involves challenges to alleged practices" that *may be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations.*

7

*Id.* (emphasis added).

Precisely the same situation exists in this pending action, calling for precisely the same finding on the ADA's associational standing. Determining how Defendants make their reimbursement decisions would not require the participation of individual dentists, but rather could be demonstrated by a review of Defendants' own records and testimony of its own employees. To the extent that any participation of the ADA's members would be required, such participation could come from the Individual Plaintiffs. *See Hospital Council of Western Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (upholding associational standing even though the participation of *some* association members would be required, and explaining that it is only when "'the nature of the claim and the relief sought . . . make[s] the individual participation of *each injured party indispensable* to proper resolution'" of the claim that associational standing is not warranted) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *Retired Chicago Police Ass'n v. Chicago*, 7 F.3d 584, 603 (7th Cir. 1993) (associational standing found notwithstanding fact intensive nature of association's claims, which would be "supplied by the evidentiary submissions by some of the members").[5]

Defendants' challenge to the ADA's standing in this action for injunctive and declaratory relief should be rejected.

---

[5] *See National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 914 (2nd Cir. 1988) (generic pharmaceutical trade association has standing to sue for injunctive relief on behalf of its members under third prong of the *Hunt* test); *Action Alliance of Senior Citizens v. Snider*, 1994 U.S. Dist. LEXIS 10034, *8 (E.D. Pa. July 18, 1994) ("[P]articipation of individual members is rarely necessary when injunctive relief rather than individual damages is sought. This is particularly true where, as appears from the fact of the complaint here, a broad based change in procedure rather than individualized injunctive relief is sought.").

### III.   THE MCCARRAN-FERGUSON ACT
###         DOES NOT BAR PLAINTIFFS' RICO CLAIMS

Defendants have no grounds to dismiss the RICO claims in the Complaint based on the

McCarran-Ferguson Act, 15 U.S.C. § 1012(b) ("McCarran Ferguson" or "MFA").  There are at least

two reasons why Defendants' invocation of McCarran Ferguson is wrong: first, it does not apply to

the claims made in this action by providers against the Defendants; and second, the insurance laws

of the states in which the Individual Plaintiffs reside are not inconsistent with these Plaintiffs' RICO

claims.

### A.   Because the Relationship between an Insurance Company
###       and Providers Falls Outside the Business of Insurance,
###       McCarran-Ferguson Is Not Applicable

The McCarran-Ferguson Act provides:  "No Act of Congress shall be construed to

invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance . . . ."  15 U.S.C. at 1012(b).  In the subscriber track litigation cited by

Defendants, *In re Managed Care Litig.*, 185 F. Supp. 2d at 1321, it was undisputed that the

relationship between subscribers and their insurance companies fell within the business of insurance.

Here, in distinct contrast, the relationship between providers and Defendants falls outside the

business of insurance.  As a result, McCarran-Ferguson cannot reverse-preempt the RICO claims

asserted by Plaintiffs.

*Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979), which

Defendants ignore, is directly on point.  There, the Supreme Court held that agreements with

participating pharmacies to provide drugs to insureds were not within the business of insurance, and,

therefore, the claim made was not preempted by McCarran-Ferguson.  Noting that McCarran-

9

Ferguson applies to the "business of insurance," and not the "business of insurers," the Court held that such provider agreements did not constitute the business of insurance, which it defined as "the spreading and underwriting of a policyholder's risk." *Royal Drug*, 440 U.S. at 211. As the Court concluded:

> The Pharmacy Agreements thus do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the "business of insurance."

*Id.* at 214-215 (noting that in enacting McCarran-Ferguson Congress was concerned with the "relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement – these were the core of the 'business of insurance'"); *see Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982) (holding that a peer-review process to determine the reasonableness of charges was outside the business of insurance).[6]

The in-network dental provider agreements at issue in this litigation, like the pharmacy agreements at issue in *Royal Drug*, have nothing to do with underwriting or the spreading of risk. Accordingly, they fall well outside the business of insurance and disputes concerning these agreements are not preempted by McCarran-Ferguson.

---

[6] *See Pritt v. Blue Cross & Blue Shield*, 699 F. Supp. 81 (S.D. W. Va. 1988) (in-network provider agreement was not the business of insurance); *St. Bernard Hosp. v. Hospital Serv. Ass'n*, 618 F.2d 1140 (5th Cir. 1980) (agreement between contracting hospital and insurer held to be outside the business of insurance) .

**B.    The Insurance Laws of the States in which the Individual
Plaintiffs Reside are Not Inconsistent with their RICO Claims**

Defendants contend that Plaintiffs' RICO claims are preempted by McCarran-Ferguson because there is no private right of action under the state insurance laws of Illinois and Nebraska, where the Individual Plaintiffs reside.  Defendants' arguments blithely dismiss the seminal holding in *Humana v. Forsyth*, 525 U.S. 299 (1999), in which the Supreme Court squarely held that McCarran-Ferguson does not bar application of the RICO statute to fraudulent acts of insurers and health maintenance organizations.  Moreover, Defendants' position is based on a patent misreading of applicable case law, including *Humana*, which establishes that the assertion of RICO claims does not impair the insurance laws of a state as long as such state authorizes *common law* actions for insurance fraud, not just *statutory* private causes of action.  As set forth further below, contrary to Defendants' contention, Illinois and Nebraska allow common law actions for insurance fraud.  Indeed, virtually all, if not all, states permit such actions.

In *Humana,* 525 U.S. at 313, the Supreme Court unanimously held that RICO did not conflict with Nevada's Unfair Insurance Practices Act, stating that where, as here, RICO actions are used to complement state insurance policy, as opposed to conflicting or interfering with them, McCarran-Ferguson provides no barrier to those actions.  According to the Court's analysis, where a RICO claim focuses on practices proscribed by state law, the fact that the federal statute offers remedial options that otherwise would be unavailable does not "impair" state law.  Thus, the Court concluded:

> Because RICO advances the State's interest in combating insurance fraud, and does not frustrate any articulated Nevada policy, we hold that the McCarran-Ferguson Act does not block the . . . policy beneficiaries' recourse to RICO . . . .

11

*Humana,* 525 U.S. at 314.

The *Humana* Court made clear that, with respect to RICO, McCarran-Ferguson did not preempt the field. "We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise." *Id.* at 308. The Fifth Circuit recently summarized the holding in *Humana,* putting it into a context that is directly applicable to the present action:

> In finding that RICO was not preempted by the MFA, the Court expressly rejected the view that the MFA authorized a state-supremacy "field preemption" approach to the application of federal law to the insurance industry. Instead, the Court emphasized that MFA preemption is to be examined within a "conflict preemption" rubric, and that, as such, the analysis will turn on one of two axes: (1) the existence of an express conflict with the letter of the state law; or (2) the frustration of an officially articulated state regulatory goal. Moreover, the Court rejected an implicit presumption against the application of federal law in insurance contexts, stating instead that federal law is to be applied in an insurance context where it can be applied in harmony with state law.

*Dehoyos v. Allstate Corp.,* 345 F.3d 290 (5th Cir. 2003). This is exactly the case here. Because Illinois and Nebraska law, as set forth below, prohibit managed care companies from engaging in the very abuses that Plaintiffs allege were fraudulently misrepresented or not disclosed to them, it is plain that Plaintiff's RICO action helps advance these states' interest in combating abusive insurance practices. As a result, far from frustrating Illinois and Nebraska policy, the RICO action here works to advance it. *See also Bancoklahoma Mortg. Corp. v. Capital Title Corp.,* 194 F.3d 1089, 1099 (10th Cir. 1999) (holding that RICO claims that advance a state's insurance regulatory interests and do not frustrate any articulated state policy are not barred by McCarran-Ferguson).

In *Moore v. Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209, 1220-23 (11th Cir. 2001), *cert. denied,* 535 U.S. 1018 (2002), the Eleventh Circuit took a similarly narrow view of preemption,

holding that under McCarran-Ferguson a state's unfair discrimination statute did not conflict with, and therefore did not preempt, federal claims under 42 U.S.C. §§ 1981 and 1982. As that court concluded, "[t]he federal rule does not contradict directly the terms of the state statute or render it impossible to effect or implement that statute. The rules proscribe different, though possibly overlapping, conduct and do not conflict directly." *Moore*, 267 F.3d at 1221.

The crux of Defendants' argument in favor of preemption is its contention that *Humana* only permits RICO claims against fraudulent insurance practices if a relevant state *statute* expressly authorizes a private cause of action for insurance fraud. But this is clearly an erroneous application of *Humana*, which, in interpreting the Nevada Unfair Insurance Practices Act, explicitly noted that a *common law action* under state law, as well as a statutory private right of action, is sufficient to establish that RICO claims are consistent with and would not "impair" the state's policy within the meaning of McCarran-Ferguson:

> Moreover, the Act is not hermetically sealed; it does not exclude application of other state laws, statutory or *decisional*. Specifically, Nevada law provides that an insurer is under a *common-law duty* "to negotiate with its insureds in good faith and to deal with them fairly."

*Humana*, 525 U.S. at 312 (citations omitted) (emphasis added). As the *Humana* Court concluded: "In sum, we see no frustration of state policy in the RICO litigation at issue here. RICO's private right of action and treble damages provision appears to complement Nevada's statutory and *common-law* claims for relief." *Id*. at 313 (emphasis added).

In *Bancoklahoma*, 194 F.3d at 1099, the Tenth Circuit explicitly recognized that *Humana's* decision allowing the application of RICO to insurance fraud was based on the existence of common law as well as statutory remedies in Nevada to control insurance fraud. Similarly, in

13

*Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185, 193 (3d Cir. 1998), *cert. denied*, 525 U.S. 1129 (1999), which involved one of the same defendants as in the present action, the Third Circuit held that a private RICO action did not conflict with Pennsylvania's Unfair Insurance Practices Act ("UIPA"), and explicitly concluded that, despite the lack of a statutory private cause of action under UIPA, Pennsylvania courts "have not barred common law actions for fraud and deceit arising out of insurance practices." *Sabo*, 137 F.3d at 192; *accord Grider*, 2003 U.S. Dist. LEXIS 16551 (MFA does not preclude RICO claims against HMO for insurance fraud dispute absence of private remedy in UIPA; both common law and statutory actions pursuant to general consumer protection statutes have been allowed in Pennsylvania).

### 1. Illinois Allows Private Actions for Insurer Misconduct

Illinois' laws expressly allow both statutory and common law remedies for insurance fraud. Indeed, Defendants' argument to the contrary is disingenuous.

In *Cramer v. Insurance Exch. Agency*, 675 N.E.2d 897, 904 (Ill. 1996), the Supreme Court of Illinois definitively established that "where a plaintiff actually alleges and proves the elements of a separate tort, a plaintiff may bring an independent tort action, such as common law fraud, for insurer misconduct." Similarly, in *Manning v. Valor Ins.*, 1999 U.S. Dist. LEXIS 4577 at *7-*8 (N.D. Ill. March 25, 1999), the court held that although the conduct of which plaintiff complained may have violated the Illinois Improper Claims Practices Act ("IICPA"), 215 Ill. Comp. State 5/154.5-6, for which there was no express private right of action, the plaintiff "does not . . . lose his ability to pursue his tort claims simply because [defendant's] alleged action also support other causes of action." *See also Industrial Enclosure Corp. v. Northern Ins. Corp.*, 1998 U.S. Dist. LEXIS 19453 at *21-*22 (N.D. Ill. Nov. 30, 1998) (holding that misconduct of insurer is actionable

pursuant to the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505; *Commonwealth Ins. Co. v. Store Container Corp.*, 2001 U.S. Dist. LEXIS 11100 (N.D. Ill. May 3, 2001).[7]

### 2. Nebraska Permits Private Actions for Tortious Acts by Insurance Companies

Defendants' "exposition" of Nebraska law is similarly flawed. In cases such as *Luscher v. Empkey*, 293 N.W.2d 866 (1980), the Nebraska Supreme Court recognized that a private right of action for fraud against insurance companies existed under Nebraska common law. Although Defendants cite *Wineinger v. United Healthcare Ins. Co.*, 2000 U.S. Dist. LEXIS 1849 (D. Neb. Feb. 16, 2000), for the proposition that the lack of an express private right of action under Nebraska's Unfair Claim Settlement Practices Act, Neb. Stat. 44-1540(3)-(4), bars RICO claims for plaintiffs in that state, they ignore the fact that the *Wineinger* court did not decide whether there was an implied private right of action. Moreover, the *Wineinger* court disregarded the holding in *Humana* that there is no conflict preemption so long as a state common law action against an insurer for fraudulent conduct is permitted. As a result, it cannot be contended that RICO invalidates, impairs, or supersedes this statutory scheme.

Moreover, in *Kirwan v. Chicago Title Ins. Co.*, 612 N.W.2d 515 (2000), *aff'd in part and*

---

[7] In *American Serv. Ins. Co. v. Passarelli*, 752 N.E.2d 635 (Ill. App. 2001), cited by Defendants, the court did *not* hold that a common law or statutory right of action may not be brought for insurer misconduct. Rather, it held only that there is no such specific private right of action pursuant to § 154.6 of the IICPA, and that any claim under 215 Ill. Comp. Stat. 5/155, for which there *is* a private right of action, must be brought in a court proceeding, not by way of arbitration. *Langendorf v. Travelers State Ins. Co.*, 625 F. Supp. 1103 (N.D. Ill. 1985), is also inapposite. There, the court merely noted that § 154.6 provided no private right of action and, significantly, upheld the applicability of § 155. Nothing in these cases conflicts with the holding in *Cramer* that a plaintiff may assert common law fraud, or other independent tort actions, for insurer misconduct in Illinois.

*rev'd in part on other grounds*, 624 N.W.2d 644 (2001) -- a case decided after *Wineinger* -- the Nebraska appellate court entertained the plaintiffs' claims under Nebraska's Unfair Insurance Trade Practices Act, Neb. Stat. 44-1521 to -1535, (although ultimately granting summary judgment against the plaintiffs on the ground that there were no misrepresentations). This decision fatally undermines Defendants' interpretation of Nebraska law.

Defendants also ignore other statutory sources. There is a private right of action under the Nebraska Consumer Protection Act, Neb. Stat. 59-1601 to -1622. In *Kuntzelman v. Avco Fin. Servs.*, 291 N.W.2d 705, 707 (Neb. 1980), the Nebraska Supreme Court held that a tortfeasor is not immune from private suits under such statute merely because their acts fall within the jurisdiction of a regulatory body -- such as the Director of Insurance.[8]

Defendants' contention that McCarran Ferguson preempts Plaintiffs' RICO claims should be rejected.

## IV. PLAINTIFFS HAVE ADEQUATELY PLED VIOLATIONS OF RICO IN COUNTS I-IV OF THE COMPLAINT

### A. Plaintiffs' Properly Allege a Managed Care "Enterprise"

Defendants contend that Plaintiffs have failed to adequately plead a RICO enterprise. This argument must fail. Section 1962(c) of RICO makes it illegal to "conduct or participate,

---

[8] Defendants' reliance on *Braunstein v. General Life Ins. Co.*, 2002 U.S. Dist. LEXIS 24853 (S.D. Fla. Nov. 18, 2002), is also misplaced. *Braunstein* held that a class action brought under RICO was barred under McCarran-Ferguson because the Florida Unfair Insurance Trade Practices Act ("FUITPA") contained a 60 days' notice provision before suit was brought and also precluded class actions. Defendants do not suggest that either Illinois or Nebraska contain similar limitations in their statutory schemes. Moreover, that court ignored the FUITPA's "savings clause," providing that "the civil remedy specified in this section does *not preempt any other remedy or cause of action* provided for pursuant to any other statute or pursuant to the common law of this state."

16

directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). An association-in-fact enterprise includes a group of persons who are associated together for a "common purpose of engaging in a course of conduct." *United States v. Turkette*, 425 U.S. 576, 583 (1981).

In *United States v. Goldin Indus.*, 219 F.3d 1271, 1275 (11th Cir. 2000), *cert. denied*, 531 U.S. 1015 (2000), which Defendants inexplicably ignore, the Eleventh Circuit held that "a RICO enterprise need not possess an 'ascertainable structure' distinct from the association necessary to conduct the pattern of racketeering activity." This "association of individual entities, however loose or informal . . . furnishes a vehicle for the commission of two or more predicate crimes" that comprise the racketeering activity. Allegations that the purported enterprise is "an ongoing organization, formal or informal" and that "the various associates function as a continuing unit" are sufficient to meet the "enterprise" pleading standard. *Id.*

Plaintiffs have satisfied these pleading requirements. Far from pleading an "amorphous group of unidentified, unrelated market participants," Defs' Mem. at 11, the Complaint specifically alleges that Defendants, health insurance companies, along with specifically named third parties which either promulgate dental patient care guidelines utilized by Defendants or devise software processing systems to implement such guidelines, not only have direct contractual relationships with each other but closely coordinate their work for a common purpose: to profit from the denial and/or delay of legitimate payments to providers who perform dental services for Defendants' subscribers. Compl. ¶¶ 62-67. The Civil RICO Case Statement ("RCS") expands upon these allegations to

17

include, *inter alia*, specifically named trade associations used by Defendants to conceal their wrongdoing.  RCS ¶ 6(a)-(b)(11).

In challenging Plaintiffs' enterprise allegations, Defendants selectively rely on various decisions in *In re Managed Care Litig.*, but conspicuously fail to mention the subsequent decision in that action which upheld the subscriber track plaintiffs' "enterprise" allegations on facts closely analogous to the present case.  *In re Managed Care Litig.*, 185 F. Supp. 2d at 1322-24.  There, the court sustained the viability of a RICO "enterprise" that consisted of  "the Defendant, the Defendant's health plans, and the primary physicians, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, [and] home health agencies who contract with the Defendant," adding:

> All of these entities are said to be "associated in fact as part of the health care network with common purposes of providing medical services to [the insurance company's] customers and earning profits from the providing of those services."

*Id.* at 1323.  In upholding such enterprise pleading, the Court reiterated that "[t]here is ... no strict 'structure' requirement in the Eleventh Circuit."  *Id.*; *see Avirgan v. Hull*, 932 F.2d 1572, 1578 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992) ("[A] RICO enterprise may be an 'amoeba-like' structure of a loose informal association.").

The *In re Managed Care Litig.* court also emphasized that the "Plaintiffs . . . have not alleged a series of random contractual exchanges, but a network of physicians, hospitals, pharmacies and health care professionals through which the Defendants deliver health care to the subscribers." *In re Managed Care Litig.*, 185 F. Supp. 2d at 1323-24.  Plaintiffs in this action have alleged, if anything, an even more "tightly-knit" enterprise and coordinated structure of insurance companies

18

and parties that devise and implement the specific guidelines that the Defendants utilize to

improperly and fraudulently deny and delay legitimate payments to Plaintiffs.

Consequently, Defendants' conclusory assertions that the members of the "enterprise"

fail to act for a "common purpose" or as a "functioning unit" ring hollow.  Plaintiffs have gone far

beyond mere allegations that the entities which form the enterprise are members of the same industry

or trade association or have random contractual relationships; instead, the Complaint expressly

alleges that such entities knowingly and deliberately worked together and coordinated their activities

in the following manner, in order to defraud Plaintiffs and deny them their just compensation:

> (a)    The development and adoption of specific clinical practice guidelines and related healthcare review criteria such as those established by Milliman;
>
> (b)    The development and utilization of automated and integrated claims processing and other systems such as those generated by McKesson and Dentistat, and the configuration and use of such systems to similarly deny, reduce and delay payments to dental providers;
>
> (c)    Participation and coordination in trade associations that develop common industry standards and/or act as vehicles for the exchange of sensitive business information; and
>
> (d)    Participation in and coordination through private, jointly owned partnerships and corporations such as Dentistat and Dentalxchange, Inc. ("Dentalxchange"), which facilitate Defendants' claims processing procedures.

Compl. ¶ 57.

The recent *Grider* decision is instructive.  There, the court emphatically validated

virtually the same RICO allegations and "enterprise" pleadings as here.  Plaintiffs in *Grider* alleged

that defendants, an HMO and the insurance companies and individuals who controlled it, wrongfully

manipulated CPT codes to decrease reimbursements to providers under fee-for-service arrangements, and also "shaved" capitation payments by deliberately under-reporting the number of patients enrolled in the plaintiffs' practice groups. *Grider*, 2003 U.S. Dist. LEXIS at *6-*7. As summarized by the court, the plaintiffs alleged an enterprise that "includes defendants and various third-party entities, including software providers, claims reviewers, and trade associations," with the court explaining:

> Plaintiffs contend that defendants conduct the enterprise by using these third-parties to deny, delay and reduce payments to providers, employing a variety of techniques that are undisclosed and do not conform to plaintiffs' definition of "medically necessary."

*Id.* at *66.

In rejecting the defendants' argument that the "enterprise" allegations were insufficient, the court in *Grider* distinguished cases in which no continuing enterprise or common purpose had been alleged, or where there was no description of the role played by the non-defendant entities in the illegal activities. *Id.* at *68. In contrast, in holding that the "enterprise" allegations before it were sufficient, the court explained:

> While the Complaint here does list a number of unnamed third parties as being part of the enterprise, the later-filed RICO Case Statement provides a named list of entities that make up the alleged Managed Care Enterprise. Plaintiffs then describe how defendants allegedly use non-party firms to further the RICO violations, employing such devices as "common billing forms, a 'technology alliance' and 'central coordination' to accomplish their systematic scheme to deny, delay and diminish payments to plaintiffs."

*Id.* at *68-*69.

The *Grider* court further emphasized that the plaintiffs adequately alleged "that the relationships between the defendants and the other entities that make up the enterprise go beyond

20

ordinary business dealings." *Id.* at 69.  Moreover, "[w]hile greater specificity with respect to structure and the interrelationship between the portions of the alleged enterprise would no doubt be desirable, it is uncertain as to how plaintiffs could accomplish this without discovery." *Id.*[9]

The analyses in both *In re Managed Care Litig.* and *Grider* conclusively establish that Plaintiffs have adequately pled a RICO enterprise. As in *Grider*, Plaintiffs "have identified the parties who make up the enterprise, described how these parties may be associated through financial incentives, and sufficiently alleged that the entities form a continuing unit with a common course of conduct." *Grider*, at *13. That is all that is required at the pleading stage.

**B.**    **Plaintiffs Properly Plead "Direction" And "Control" Under Section 1962(c)**

Relying on *Reves v. Ernst & Young*, 507 U.S. 170 (1993), Defendants contend that Plaintiffs have failed to allege sufficiently that they participate in the managed care enterprise's affairs within the meaning of 18 U.S.C. § 1962(c). Under *Reves*, this means alleging that Defendants have "some part in directing [the enterprise's] affairs." *Id.* at 179; *In re Managed Care Litig.*, 185 F. Supp. 2d at 1324. Plaintiffs have done so. They have pled with great specificity the Defendants' control and operation of the managed care enterprise. Indeed, ¶ 66 of the Complaint details how Defendants "control and operate the Dental Enterprise," stating:

> (a)    By developing by themselves, and engaging and paying Milliman to develop, generalized standards and dental patient care guidelines as actual criteria to systematically deny claims without regard to medical necessity or coverage;
>
> (b)    By agreeing to use, and using, such guidelines to reduce or pend claims;

----

[9] As further noted in *Grider*, "there is no heightened pleading standard for allegations of a RICO enterprise." *Id.* at *69.

(c)     By engaging and paying McKesson and Dentistat to develop automatic systems for editing and manipulating the claims information contained in submitted claims forms;

(d)     By agreeing to use, and using, those systems to process claims and deny or diminish payment;

(e)     By utilizing, supporting and, in some cases, maintaining Board of Director or other executive positions within dental trade associations, as a vehicle for the communication, exchange, and dissemination of information necessary to Defendants scheme;

(f)     By developing, participating in the use of, and purchasing ownership interests in electronic claims processing companies such as Dentalxchange and Dentistat, as a common entry point for dental provider claim data to assist the Defendants in processing Plaintiffs' claims in a coordinated fashion;

(g)     By exchanging upper level employees to facilitate unified and concerted action. For example; Kevin Tylus became Senior Vice President of Distribution for CIGNA Health Services (overseeing CIGNA Healthcare's dental division), having previously led Prudential Insurance Company's Northeast managed care operation and its integration with Aetna; and William Jackson, Senior Vice President of Dentalxchange.com, previously held senior positions at Prudential (now a part of Aetna).

In *In re Managed Care Litig.*, 185 F. Supp. 2d at 1324, the court held that the subscriber track plaintiffs' RICO claims against managed care insurance companies for a fraudulent scheme to deny and delay payments properly pled that defendants had "operate[d] or manage[d]" the enterprise. The identical conclusion should be reached here, where the allegations that Defendants orchestrated the systematic denial and delay of legitimate provider payments by, *inter alia*, hiring third party contractors to develop and implement guidelines and software to make claim determinations without regard to medical necessity or coverage, and by exchanging information and employees to ensure a coordinated and unified approach to their scheme to deny and delay claims, satisfying the operation or control tests sufficient to state a § 1962(c) claim.

22

In fact, in *Grider*, the Court held that much less specific allegations than those contained in this action adequately pled "direction and control" under § 1962(c):

> Plaintiffs' Complaint explicitly avers that "defendants maintain an interest in and control of the Managed Care Enterprise and also conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity."
>
> Although defendants complain that plaintiffs failed to plead specific facts to link individual defendants to management of the enterprise, the cases that defendants cite and Federal Rule of Civil Procedure 8(a) do not require such specificity.

2003 U.S. Dist. LEXIS at *73-*77. The detailed pleadings in this matter easily satisfy the RICO pleading standings as applied in both *In re Managed Care Litig.* and *Grider*.

## C.    Plaintiffs Have Adequately Pled Mail and Wire Fraud as Predicate Acts for Their RICO Claims

Defendants claim that Plaintiffs have failed to plead their mail and wire fraud claims with particularity under Fed. R. Civ. P. 9(b). Plaintiffs have done so. Plaintiffs have specifically alleged what the misrepresentations and omissions were, explained their content, stated how they were misled, and described what Defendants gained and Plaintiffs lost as a result. Compl. ¶¶ 34, 36-39, 44, 70-76. In the RCS 5(b)-(c) (1)-(2), Plaintiffs detail numerous specific instances in which Defendants sent, electronically or by mail, benefit statements or EOB forms that contained fraudulent statements. By way of example, Plaintiffs identified four such incidents, on or about October 10, 2002, May 22, 2002, February 10, 2003 and February 21, 2003, respectively, in which Defendants improperly denied payments for "separately compensable dental treatments" by falsely claiming, *inter alia*, that such treatments were "a part of, and inclusive to, the primary service performed," or that the "procedure is considered a component of another listed procedure." Plaintiffs further allege

23

that Defendants purposely utilized claims edit software to automatically bundle and thus reject these claims, without disclosing such procedures to Plaintiffs.

The Complaint and the RCS further detail that Defendants' Provider Agreements and Provider Manuals, which were typically sent to Plaintiffs through the U.S. mail, also contained affirmative misrepresentations that providers would be reimbursed for covered procedures based on commonly accepted medical practice and on standard coding practices. Compl. ¶¶ 25-26; RCS 5(b)-(c)(2) (6).

In *In re Managed Care Litig.*, 135 F. Supp. 2d at 1263, the plaintiffs had alleged, as here, that the defendants "engaged in a systematic, fraudulent scheme of automatic downcoding, CPT code manipulation, [and] improper bundling." Significantly, while Defendants concede that "virtually identical RICO" claims were alleged in that action, they fail to advise the Court that the *In re Managed Care Litig.* court *upheld* the plaintiffs' predicate acts of mail and wire fraud.  The same conclusion is warranted here.

Defendants' response that their alleged acts of fraudulent concealment and omissions are not actionable under RICO is plainly wrong.  In *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000), the Eleventh Circuit made clear that "it would be an error to find that a duty to disclose information for purposes of the federal mail and wire fraud statutes can only be found where a statute, regulation, or formalized legal relationship between the parties expressly delineates such a duty."  The Court further explained:

> [C]oncealment of critical data, even without a formalized duty to disclose that data, can constitute mail and/or wire fraud in certain situations. Schemes to defraud can take many forms-criminal ingenuity is an amazing, if disturbing, thing to behold. *It would be unduly constrictive to hold that a duty to disclose can only exist where it is statutorily or contractually*

24

> *implied*; the complexity of transactional relationships is such that duties to disclose may exist in other situations if the transaction is to be legitimate. We can envision many situations in which a failure to disclose information could constitute fraud pursuant to 18 U.S.C. §§ 1341 and 1343, *even when no duty to disclose exists independently*.  Determinations as to whether a duty to disclose information exists must be made on a case by case basis, with appropriate attention given to the nature of the transaction and the relationship between the parties.

*Id.* at 1312-1313 (emphasis added).[10]  The majority of other federal circuits are in accord.[11]

In *Grider*, which presented claims by doctors that closely parallel those in the present case, the court upheld the vast majority of the plaintiffs' fraud allegations as predicates for their RICO claims, including those that centered on the defendants' omissions or failure to disclose their allegedly capricious and cost-based claims processing methodologies, which are also at the heart of this case.  As the *Grider* court held:

> [W]hen viewed in conjunction with the agreement's representation that defendants would pay for medically necessary services, the omissions that plaintiffs allege appear to be material and could be construed as "reasonably calculated to deceive persons of ordinary prudence and comprehension." ... Plaintiffs contend that defendants concealed that defendants (1) provide

---

[10]  Defendants' characterization of *Langford* as requiring a special relationship, such as a fiduciary duty, in order to make a failure to disclose actionable under RICO, is therefore highly misleading.  Indeed, *Langford* emphasized that "[t]he texts of the mail and wire fraud statutes are also informative, in that they do not include any language indicating that an independent duty to disclose is necessarily for liability under their terms."  *Id.*

[11]  *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991) ("The scheme need not involve affirmative misrepresentations ... the statutory term 'defraud' usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching"); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986) ("omissions or concealment of material information can constitute fraud ... cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation"); *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997) ("Even apart from a fiduciary duty, in the context of certain transactions, 'a misleading commission is actionable as fraud ... if it is intended to induce a false belief'").

incentives to claim reviewers to delay or deny payments; (2) developed or purchased claims systems designed to manipulate CPT codes; (3) automatically downcode claims; (4) automatically bundle claims; and (5) will not distribute money for participation in risk pools to which plaintiffs claim they are entitled.

We conclude that all of these alleged omissions from the agreement, if proven, could significantly decrease the amount of reimbursements which the contract promised to pay to plaintiffs. Likewise, such non-disclosures could have affected plaintiffs' decision to enter into the HMO-physician agreement. Accordingly, we conclude that plaintiffs have stated claims upon which relief could be granted.

*Id.* at *51 (citation omitted).

In addition to such material omissions, the *Grider* court found further that monthly statements and quarterly reports sent by defendants to the plaintiffs that allegedly misrepresented the amounts of money to which the plaintiffs were entitled also constituted actionable misrepresentations for purposes of RICO's predicate offenses. Similarly, the EOBs that the Defendants regularly sent to Plaintiffs in this action constitute affirmative misrepresentations -- false reasons for denial of payments -- that intentionally misled Plaintiffs about their entitlement to dental fees.[12]

In short, Plaintiffs' allegations of mail and wire fraud as predicate RICO acts are clearly sufficient.

**D.    Plaintiffs Have Adequately Alleged Violations of the Hobbes Act**

In addition to alleging mail and wire fraud as predicate acts, as well as violations of the

---

[12]    The only fraud claims dismissed in *Grider* related to matters that were in fact disclosed in the parties' agreements -- a defense that is not raised by, and indeed is not available to, the Defendants in this action. In addition, the *Grider* Court's dismissal of certain claims on grounds of lack of particularity -- relating to defendants' concealment that they systematically denied claims and delayed payments -- is also not applicable here, since the Complaint sets forth specific examples, by date, of defendants' communications that needlessly requested additional documentation and/or provided false reasons for the denial of payments. *See* Compl. ¶¶ 34-39, 44.

Travel Act, 18 U.S.C. § 1952(a) (which Defendants do not contest),  Plaintiffs allege violations of the Hobbs Act, which defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Detailing this claim, the Complaint states:

> Defendants have forced Plaintiffs and members of the class to accept the loss of compensation for treating Defendants' insured which results from their misrepresentation and manipulation of the workings of the payment system, and accept the denial, reduction and delay of payments for covered, medically necessary dental services which results from Defendants' automated claims processing practices, through fear of economic loss.

Compl. ¶ 78.

Defendants' attack on the Complaint's allegations of extortion as a predicate RICO offense rests entirely on a gross misreading of *Scheidler v. National Org. for Women, Inc.*, 537 U.S. 393 (2003).  In *Scheidler*, the Court held that the defendants' acts of interference and disruption directed at shutting down abortion clinics did not constitute extortion under the Hobbs Act, because the defendants did not "'receive something of value from' [the plaintiffs] that they could exercise, transfer or sell."  123 S. Ct. at 1066 (citation omitted).  The Court emphasized that "merely interfering with or depriving someone of property," such as their rights to exercise their constitutional right to an abortion, did not convey any value to the alleged wrongdoer.  *Id.*

This limitation is clearly not applicable to the present case, where Defendants' deprivation of provider payments to Plaintiffs created a direct, tangible economic benefit upon Defendants -- the monies that they retained and thus, under *Scheidler*, could "exercise, transfer or sell."  Defendants' misguided attempt to read into *Scheidler* a requirement that the "extortionist" physically obtain something that is already in the victim's possession is completely unwarranted, and

finds no support in any case law.  In effect, Defendants' argument would virtually eviscerate the Hobbs Act as applied to all cases where a party earned but did not yet receive the fruits of his labor, such as an employee whose salary was extortionately withheld by his employer.  No case law supports this radical interpretation.

Indeed, in *Grider*, 2003 U.S. Dist LEXIS 16551 at *56-*57, a case decided after *Scheidler*, the court upheld, as a predicate RICO act, a Hobbs Act claim involving allegations virtually identical to those alleged here:  that after entering into the HMO-physician agreements, "defendants began to implement a series of underhanded techniques for *cheating plaintiffs out of money they were due* under the terms of the agreement . . . ."  Consequently, *Grider* completely undermines defendants' argument that the Hobbs Act is somehow rendered impotent merely because monies are wrongfully withheld from, rather than turned over by, their rightful recipients. *See Castle v. Cohen*, 676 F. Supp. 620, 631 (E.D. Pa. 1987), *aff'd in part and remanded in part on other grounds*, 840 F.2d 173 (3d Cir. 1988) (Hobbs Act requires showing that defendant "obtained or *withheld* the property allegedly extorted").

In *In re Managed Care Litig.*, 135 F. Supp. 2d at 1263-65, based on allegations that, again, are conceded by Defendants to be "virtually identical" to the ones contained in the Complaint, the court also found sufficient extortion claims alleged by medical providers against managed care companies. The court similarly upheld the extortion allegations asserted in the subscriber cases. *In re Managed Care Litig.*, 150 F. Supp. 2d 1330 (S.D. Fla. 2001) at 1348-50.  For the same reasons, Plaintiffs' extortion claims should be upheld here.

Finally, Defendants point to the lack of allegations of physical violence, and characterize their conduct as merely hard bargaining, recycling the same three cases presented to, and rejected

28

by, the court in *In re Managed Care Litig.* as justifying dismissal of the extortion claims.  As that

court noted:

> The Defendants strongly argue that if the Plaintiffs were injured, their
> bruises are a result of nothing more than perfectly legal hard bargaining
> carried out at arm's length between participants in the health care market.
> . . . *Robert Suris Gen. Contractor Corp. v. New Metropolitan Fed. Sav. &
> Loan Ass'n*, 873 F.2d 1401, 1405 (11th Cir. 1989).  *See also Lee v.
> Flightsafety Services Corp.*, 20 F.3d 428, 433 (11th Cir. 1994) (take-it-or-
> leave-it bargaining alone is not wrongful enough to establish the requisite
> coercion).  The Defendants also rely heavily on *Brokerage Concepts v. U.S.
> Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998).

*In re Managed Care Litig.*, 135 F. Supp. 2d at 1264.  The court went on to note that the plaintiffs

had claimed that "they feared not only the economic loss which accompanied the contracts at issue,

but that the Defendants threatened to exclude them from the network, which, it is argued, would

eviscerate the Plaintiffs' practice and livelihood."  *Id.*  Plaintiffs' allegations in the present case are

identical.  Compl. ¶¶ 50-51, 78-79.  As a result, the *In re Managed Care Litig.* court's conclusion

is fully applicable to this action:

> The distinction between extortion and mere hard bargaining or breach of
> contract is not always clear. . . By submitting that the Defendants have in
> effect held an economic gun to the Plaintiffs' heads and used other coercive
> methods to obtain property from the providers, these Plaintiffs have
> sufficiently pled claims of extortion under the relaxed standard set forth in
> the federal pleading rules.  Hence, the Plaintiffs will have the opportunity
> to prove their economic coercion theory.

*Id.*

### E.    Plaintiffs Have Adequately Alleged A RICO Conspiracy

In Count I, Plaintiffs allege that Defendants violated 18 U.S.C. § 1962(d) by conspiring

to violate 18 U.S.C. §§ 1962(a) and 1962(c).  To do so, Plaintiffs must allege "that the conspirators

agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of

racketeering activity." *United States v. Castro*, 89 F.3d 1443, 1451 (11th Cir. 1996), *cert. denied*,

519 U.S. 1118 (1997); Compl. ¶¶ 53-54; RCS ¶ 14. The standards for pleading and proving a RICO

conspiracy were recently summarized in *United States v. Harriston*, 329 F.3d 779, 785 (11th Cir.

2003):

> The Supreme Court has made clear that the conspiracy offense of 18 U.S.C.
> § 1962(d) has lesser proof requirements than the substantive RICO offense
> under § 1962(c). "The RICO conspiracy statute, § 1962(d), broadened
> conspiracy coverage by omitting the requirement of an overt act; it did not,
> as the same time, work the radical change of requiring [proof that] each
> conspirator agreed that he would be the one to commit two predicate acts."
> *Salinas v. United States*, 522 U.S. 52, 64, 139 L. Ed. 2d 352, 118 S. Ct. 469
> (1997). Rather . . . an agreement to participate in a RICO conspiracy [may
> be demonstrated] in one of two ways: (1) by providing evidence that the
> defendant agreed to commit two predicate acts, or (2) by providing evidence
> that the defendant agreed to the overall objective of the conspiracy. *United
> States v. Abbell*, 271 F.3d 1286, 1299 (11th Cir. 2001), *cert. denied*, 154 L.
> Ed. 2d 16 (2002). "If . . . an agreement [can be proven] on an overall
> objective, [there] need not [be proof that] a defendant personally agreed to
> commit two predicate acts." *Id.* [It is also not necessary] to show that the
> defendant explicitly agreed with his co-conspirators to commit the
> substantive RICO [offenses]. *United States v. To*, 144 F.3d 737, 744 (11th
> Cir. 1998).

Moreover, the *Grider* court sustained the RICO conspiracy claim, stating:

> Plaintiffs' Complaint explicitly avers that "each defendant, with knowledge
> and intent, agreed to the overall objective of the conspiracy and each
> defendant agreed to commit at least two predicate acts and each Defendant
> agreed to participate in the conspiracy." . . . Moreover, Plaintiffs'
> Complaint continues by explaining in great detail the various actions that
> the named defendants undertook to implement a conspiracy to delay and
> deny payments due.

2003 U.S. Dist. LEXIS at *78-*79.[13] It is well-established that a "RICO agreement need not be

_____

[13] In a portion of *In re Managed Care*, 135 F. Supp. 2d at 1266, that Defendants also
ignore, the court also held on extremely similar facts that plaintiffs in the provider cases
adequately pled a conspiracy claim under § 1962(d), but dismissed such claim without prejudice
because of defects in the "enterprise" allegations which are not applicable here.

established by direct evidence; it may be inferred from the conduct of the participants." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997); *United States v. Majors*, 196 F.3d 1206, 1210-11 (11th Cir. 1999), *cert. denied*, 529 U.S. 1137 (2000) (a RICO conspiracy "may be proved by either direct or circumstantial evidence"). The pleading requirements for conspiracy, as detailed in these cases, are easily met here.

Defendants' contention that the conspiracy allegations are merely conclusory is without basis. Not only does the Complaint specifically identify by name numerous third party participants in the conspiracy who enabled Defendants to deny and delay bona fide payments to Plaintiffs, but the Complaint details the manner in which such conspiracy was carried out:

> Defendants have conducted and implemented their conspiracy through:
>
> (a)   The development and adoption of specific clinical practice guidelines and related healthcare review criteria such as those established by Milliman;
>
> (b)   The development and utilization of automated and integrated claims processing and other systems such as those generated by McKesson and Dentistat, and the configuration and use of such systems to similarly deny, reduce and delay payments to dental providers;
>
> (c)   Participation and coordination in trade associations that develop common industry standards and/or act as vehicles for the exchange of sensitive business information; and
>
> (d)   Participation in and coordination through private, jointly owned partnerships and corporations such as Dentistat and Dentalxchange, Inc. ("Dentalxchange"), which facilitate Defendants' claims processing procedures.

Compl. ¶ 57.

Defendants mis-characterize the Complaint by suggesting that the conspiracy allegations

31

merely allege "consciously parallel action" or that the conspirators, under circumstantial evidence, "had to agree." In fact, the Complaint explicitly alleges an actual agreement. Compl. ¶ 54. Moreover, not only is there strong circumstantial or implied evidence of the conspiracy, but the very fact that members of the conspiracy had business dealings and contractual relationships with each other, directly relating to the review and determination of dental provider payments, creates a prima facie showing, at least for pleading purposes, that a conspiracy existed. For example, the development of clinical practice guidelines and healthcare review criteria by Milliman, and the creation of automated and integrated claims processing systems by McKesson and Dentistat, which were done at the direction of and for the direct benefit of defendants, Compl. ¶¶ 56-57, demonstrate that Plaintiffs have satisfied their pleading requirements under § 1962(d).

Defendants also cite *In re Managed Care*, 150 F. Supp. 2d at 1350, for the proposition that the conspiracy claim should be dismissed for failing to identify the non-defendant conspirators. There, the court found fault "because the *principal* co-conspirators are not listed within the four corners of the complaint." *Id.* Here, the Complaint specifically identifies the primary non-party co-conspirators: Dentistat, Inc. ("Dentistat"), Milliman USA ("Milliman"), McKesson Corporation ("McKesson") and Dentalxchange, Inc. ("Dentalxchange"), who all were instrumental in the development and implementation of the guidelines and systems that were designed to deprive plaintiffs of their duly earned provider fees. The fact that there are other unknown or unnamed co-conspirators is not fatal to a RICO claim. *See Forest Travel Agency, Inc. v. Duvall*, 1988 U.S. Dist. LEXIS 1541 at *5 (N.D. Ill. Feb. 19, 1988) (holding that it was not necessary that "plaintiff must invariably name the defendant's fellow participants in the fraud" for "[t]here may be . . . particular circumstances in which it is obvious that there were multiple participants in a fraud but that plaintiff

cannot ascertain their identities"); *Carlstead v. Holiday Inns, Inc.*, 1986 U.S. Dist. LEXIS 19302 at *26 (N.D. Ill. Oct. 9, 1986) (although the complaint alleging a RICO conspiracy pled the existence of "unnamed others" there was "no requirement that a plaintiff seek damages from every member of a RICO conspiracy"). The conspiracy claim should therefore be sustained.

### F.   Plaintiffs' § 1962(a) Allegations State a Cognizable Claim

18 U.S.C. § 1962(a) provides that:

> it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds, of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commence.

Plaintiffs have explicitly alleged that Defendants "receive income from their participation as principals in an extensive pattern of racketeering activity," Compl. ¶ 86, and reinvest such income "to finance future racketeering activity, and the future operation of the Dental Enterprise." *Id.* ¶ 87. The Complaint further alleges that "Defendants use the income to buy additional health insurance companies or plans, which increases the scope and size of the Dental Enterprise, the reach of their fraudulent scheme, and their power to perpetuate and enforce it." *Id.*

Defendants contend that Plaintiffs have not adequately alleged that they suffered injury from the investment or reinvestment of racketeering income, as distinct from an injury flowing from the predicate acts themselves. Yet, even assuming *arguendo* that this is the governing test, Plaintiffs clearly satisfy it. In *In re Managed Care Litig.*, the Court upheld a § 1962(a) claim based on allegations almost identical to the present case:

> Plaintiffs' complaints state that each Defendant used or invested a signifi-

33

> cant part of the income or proceeds from the operation of its investment enterprise, and this "use or investment injured the Plaintiff and Class members because it *permitted such enterprise to continue, expand, and extend its fraudulent schemes and artifices and to acquire other HMO, PPO and POS organizations that were incorporated into the enterprise,* thereby increasing its revenue and profits."

150 F. Supp. 2d at 1352 (emphasis added).  Other cases decided in this District have also upheld § 1962(a) claims based on similar allegations.  *See Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.,* 814 F. Supp. 1084, 1095 (S.D. Fla. 1992) (Section 1962(a) injury properly alleged where "the investment of the income fraudulently obtained allegedly enable the Defendants to perpetuate the operation of the enterprise and continue to defraud" the plaintiff); *Avirgan,* 691 F. Supp. at 1362 ("[A] plaintiff's injury may be caused by the operation of the enterprise in which the defendant invested the proceeds derived from the pattern of racketeering activity"); *In re Sahlen & Assocs., Inc. Sec. Litig.,* 773 F. Supp. 342, 367 (S.D. Fla. 1991) ("By investing . . . income back into the enterprise, Defendants were able to guarantee the continuance of the scheme").[14]

Although Plaintiffs have met this more stringent test, which has been adopted in some other courts, this District, as Defendants concede, has explicitly endorsed the Fourth Circuit standard, articulated in *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 836-40 (4th Cir. 1990), which allows a plaintiff to bring a § 1962(a) claim based solely on injuries flowing from the predicate racketeering acts.  In *In re Managed Care Litig.,* the court convincingly explained why *Busby's* rejection of the "investment injury requirement" was compelled by both the statutory construction of RICO's language and its essential purpose:

---

[14] *Accord Masi v. Ford City Bank & Trust,* 779 F.2d 397, 401 (7th Cir. 1986) (upholding § 1962(a) claim based on allegation that bank utilized racketeering funds to operate its banking enterprise).

34

First, Section 1962(a) does not require an investment injury because the "by reason of" language of Section 1964(c) grants compensation for injuries sustained solely under the "receipt of income from a pattern of racketeering activity" statutory language within Section 1962(a). *Busby*, 896 F. 2d at 837. Second, a separate investment injury requirement, together with the section 1962(c) person/enterprise distinction, would eviscerate corporate liability because it is nearly impossible to prove that the injury flowed from investment given that the predicate acts usually produce the injury sued upon. *Id.* at 838-39. Finally, the [*Busby*] court found support for its position in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985) and *American National Bank & Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 87 L. Ed. 2d 437, 105 S. Ct. 3291 (1985) (per curiam), which assessed the requirements of 1962(c). Passages from these two cases, phrased in a way applying to section 1962 as a whole, state that injury from the predicate racketeering acts alone is actionable under section 1964(c). The Busby court concluded that the Supreme Court would logically extend these cases to acknowledge standing in a section 1962(a) action without investment injury. *Busby*, 896 F.2d at 839.

150 F. Supp. at 1351-52; *accord Avirgan*, 691 F. Supp. at 1362.

Defendants' argument that Plaintiffs' § 1962(a) claim is defective because a § 1962(a) enterprise must be a "victim" has been unanimously rejected by all courts, which have held that § 1962(a) does not even require that the enterprise be separate or distinct from the liable persons. *See Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991).

In *Haroco, Inc. v. American Nat'l Bank and Trust Co.*, 747 F.2d 384 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985), for example, the court made clear that the liable person under § 1962(a) could even be the corporation *benefitting* from the racketeering activity:

Under subsection [1962] (a) . . . the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations. The approach to subsection (a) thus *makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in*

35

>  *accord with the primary purpose of RICO, which after all, is to reach those*
>  *who ultimately* profit from racketeering, not whose who are victimized by
>  it.

*Haroco*, 747 F.2d at 402 (emphasis added).   As this extensive line of authority demonstrates,

Plaintiffs have sufficiently stated a claim under § 1962(a).

### V.   PLAINTIFFS' CLAIMS FOR AIDING AND ABETTING VIOLATIONS OF RICO SHOULD BE SUSTAINED

Both the controlling Eleventh Circuit case on this issue, *Cox v. Administrator U.S. Steel*

*& Carnegie*, 17 F.3d 1386, 1410 (11th Cir.), *modified on other grounds, reh'g denied*, 30 F.3d 1347

(11th Cir. 1994), *cert. denied sub nom.*, 513 U.S. 1110 (1995), as well as Judge Moreno in *In re*

*Managed Care* Litig., 135 F. Supp. at 1266-67, have explicitly held that there exists a valid action

for aiding and abetting a RICO violation.

The cases primarily relied upon by defendants, such as *Central Bank of Denver, N.A. v.*

*First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and *Ziemba v. Cascade Int'l Inc.*, 256

F.3d 1194 (11th Cir. 2001), dealt strictly with aiding and abetting liability under section 10(b) of the

Securities Exchange Act of 1934 -- not RICO.   Moreover, since RICO allows a conspiracy claim

against a defendant who did not necessarily commit any of the predicate acts but who merely "agreed

to the overall objective of the conspiracy," *Harriston*, 329 F.3d at 785, it makes no sense, as

Defendants contend, that a claim for aiding and abetting a RICO offense could not exist because of

the absence of "reliance."   Because reliance is a critical element for a securities fraud claim, but is

not required for a RICO conspiracy claim, the rationale of *Central Bank* does not apply.  *See Cox*,

17 F.3d at 1406 ("there is no requirement of reliance for a principal to be liable under RICO for the

acts of its agent").   Defendants ignore this critical distinction.

Defendants continue to put forward their tired suggestion that *Central Bank* implicitly overruled *Cox*. Faced with the identical argument, the court in *In re Managed Care Litig.* rejected it, holding:

> It is the duty of this Court to follow controlling Eleventh Circuit precedent unless there is a direct Supreme Court case on the particular issue in question holding to the contrary. Therefore, the Plaintiffs can maintain a cause of action for aiding and abetting.

*In re Managed Care Litig.*, 135 F. Supp. 2d at 1267. *Cox* remains good law, and Plaintiffs' aiding and abetting claims in Count II should be upheld.

## VI.   **PLAINTIFFS HAVE STATED A CLAIM FOR INJUNCTIVE RELIEF**

Count IV of the Complaint seeks injunctive relief pursuant to 18 U.S.C. § 1964(a), which explicitly authorizes the district courts to "prevent and restrain violations of section 1962," and declaratory relief under 28 U.S.C. § 2201, authorizing related declaratory relief. The Complaint, at ¶¶ 58-61, sets forth compelling reasons why monetary damages alone are inadequate and why injunctive relief is necessary to prevent irreparable harm to Plaintiffs:

> 58.   Defendants' automated scheme to deny, reduce and delay payments to dental providers who treat their insured on a fee-for-service basis is an ongoing problem that has and will continue to cause Plaintiffs economic losses and threaten their ability to practice dentistry and serve the public health.
>
> 59.   A money judgment in this case will only compensate Plaintiffs for past losses. It will not stop Defendants' interference in dental treatment decisions, and it will not stop Defendants from continuing to confiscate the money earned by, and necessary to maintain the dental practice of Plaintiffs.
>
> 60.   No individual dental provider has a practical or adequate remedy, either administratively or at law, to recover these future losses.
>
> 61.   Where multiple lawsuits are required to redress repeated statutory violations, breaches of contract or other wrongs, there is no

adequate remedy at law and irreparable harm exists.

Clearly, such allegations, which are buttressed by the Complaint's detailed exposition of Defendants' extensive and systematic scheme to deprive the Individual Plaintiffs of duly earned fees, is more than sufficient to sustain a cause of action for permanent injunctive relief. *See United States v. Local 30*, 871 F.2d 401 (3d Cir.), *cert. denied*, 493 U.S. 953 (1989).

Defendants contend that RICO does not provide a private injunctive remedy, and selectively quotes from the full text of 18 U.S.C. § 1964, which states:

> (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate commerce, or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

> (b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .

The Seventh Circuit, in ruling that private plaintiffs have standing to seek permanent injunctive relief under RICO, stated:

> Section 1964(a) . . . grants the district courts jurisdiction to hear RICO claims and also sets out general remedies, including injunctive relief, that *all plaintiffs authorized to bring suit may seek*. Section 1964(b) makes it clear that the statute is to be publicly enforced by the attorney general and it specifies additional remedies, all in the nature of interim relief that the

38

> government may seek.  Section 1964(c) similarly adds to the scope of
> section 1964(a), but this time for private plaintiffs.  Those private plaintiffs
> who have been injured in their business or property by reason of a RICO
> violation are given a right to sue for treble damages.  As the plaintiffs note,
> this reading of the statute gives the words their natural meaning and gives
> effect to every provision in the statute.

*National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *rev'd on other*

*grounds*, 537 U.S. 393 (2003).[15]

Contrary to the Seventh Circuit's decision, Defendants contend that § 1964(a)-(b) gives

the Attorney General exclusive authority to seek interim and final injunctive relief against

racketeering activities.  This argument ignores the plain language of the statute.  Section 1964(b)

gives the Attorney General the right to seek interim injunctive relief.  However, § 1964(a), which

is the only section authorizing permanent injunctive relief, does so with no limitation on the type of

party who may seek such relief.  As the Seventh Circuit held:

> Although no one doubts that permanent injunctions are also available to the
> government, the government's availability to seek permanent, as opposed
> to interim, equitable remedies comes from the general grant of authority for
> district courts to enter injunctions found in § 1964(a), not from anything in
> § 1964(b) . . . . Given that the government's authority to seek injunctions
> comes from the combination of the grant of a right of action to the Attorney
> General in § 1964(b) and the grant of district court authority to enter
> injunctions in § 1964(a), we see no reason not to conclude, by parity of
> reasoning, that private parties can also seek injunctions under the
> combination of grants in §§ 1964(a) and (c).

*Scheidler*, 267 F.3d at 697.  That court therefore concluded:

> Congress explicitly provided for injunctive relief in § 1964(a) , although it
> did not specify in that section which plaintiffs can seek such relief.  Given
> that the next two sections describe two types of plaintiffs, the government
> and private plaintiffs, and spell out additional remedies specific to each

_____

[15] The United States Supreme Court did not reach the question of the availability of
injunctive relief under § 1964(c).  *Scheidler*, 537 U.S. at 411.

> type, we find that the only logical conclusion is that Congress intended the general remedies explicitly granted in § 1964(a) to be available to all plaintiffs.

*Id.* at 698.  Because even Defendants do not contend that § 1964 expressly denies permanent injunctive relief to private plaintiffs, this plain reading of the statute is supported by the Supreme Court's holding that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 70 (1992).

Defendants' reliance on *Religious Tech Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986), *cert. denied*, 479 U.S. 1103 (1987), is misplaced.  First, in *Scheidler*, the Seventh Circuit rejected *Wollersheim*'s reasoning, stating:

> [W]e note that the *Wollersheim* decision apparently misreads § 1964(b) when it states that § 1964(b) explicitly "permits the government to bring actions for equitable relief." *Wollersheim*, 796 F.2d at 1082.  Section 1964(b) does allow the government to seek equitable relief, but it specifically mentions only *interim* remedies.  Although no one doubts that permanent injunctions are also available to the government, the government's ability to seek permanent, as opposed to interim, equitable remedies comes from the general grant of authority for district courts to enter injunctions found in § 1964(a), not from anything in § 1964(b).

267 F.3d at 696-97.  Second, *Wollersheim* contravenes the Eleventh Circuit's law on statutory construction.  In *CBS, Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001), the court noted that, in interpreting the meaning of a statute, "it is the text of the statute . . . and certainly not someone's understanding of the circumstances which gave rise to the legislation – that has been voted on and approved by the people's elected representatives for inclusion in our country's laws. The language of our laws is the law." In *Wollersheim*, however, after noting that the "plain words" of § 1964 "place no limit on the class or category of litigants who might avail themselves of the

remedies it makes available under RICO," the court proceeded nonetheless to go beyond these plain words to consider legislative intent. *Wollersheim*, 796 F. 2d at 1083. Under statutory construction law in the Eleventh Circuit, this step was improper.[16]

Injunctive relief for private RICO litigants was also recently recognized in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003), where the Court stated:

> It would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be "liberally construed to effectuate its remedial purposes," intended, without expressly so stating, to deprive the district courts of this utilizing this classic remedial power in private civil actions brought under the act. . . . [T]he language of § 1964 . . . nowhere expressly denies courts this power in private civil actions, and thus the normal presumption favoring a court's retention of all powers granted by the Judiciary Act of 1789 prevails.

*Motorola*, 202 F. Supp. 2d at 243-44 (citation omitted); *see Chambers Dev. Co. v. Browning Ferris Indus.*, 590 F. Supp. 1528, 1540-41 (W.D. Pa. 1984); *Marshall Field & Co. v. Icahn*, 537 F. Supp. 413 (S.D.N.Y. 1982); *Vietnamese Fisherman's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993 (S.D. Tex. 1981). There can be no legitimate dispute that Plaintiffs' are entitled to pursue the injunctive relief they have requested.

## VII.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY ERISA

Defendants seek to dismiss Plaintiffs' claims for breach of contract in Count V,

---

[16] In *In re Fredeman Litig.*, 843 F.2d 821 (5th Cir. 1988), cited by defendants, the Court, after stating that most commentators believed that private injunctive relief was authorized, did not decide the issue but merely held that injunctive relief was not merited on the facts before the court. Similarly, in *Trane Co. v. O'Connor Sec.*, 718 F.2d 26 (2d Cir. 1983), the court also found a lack of irreparable harm, and expressed a particular reluctance to endorse injunctive relief based on securities violations under RICO in the absence of a criminal conviction, an issue that is not relevant to this case (and in any event has since been definitively resolved in amendments to § 1964(c)).

41

Constructive Trust/ Unjust Enrichment in Count VI, and Violation of Prompt Pay Laws in Count VII, "to the extent" that such claims are preempted under ERISA.  Given that these claims are brought on behalf of in-network dental providers, Defendants' argument is directly contradicted by the governing case law in this Circuit and elsewhere that ERISA simply does not apply.

In *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533 (11th Cir. 1994), *cert. denied*, 516 U.S. 930 (1995), the Eleventh Circuit squarely held that "state law claims brought by health care providers against plan insurers too tenuously affect ERISA plans to be preempted by the Act." *See also Lakeland Anesthesia, Inc. v. Louisiana Health Service & Indem. Co.*, 2000 U.S. Dist. LEXIS 18626, *3 (E.D. La. Dec. 6, 2000) (claim brought by health care providers for breach of its provider contract upheld as not preempted by ERISA, because the plaintiffs "have a separate and distinct right to recover from Blue Cross in their independent capacity as providers."); *Hospice of Metro Denver, Inc. v. Group Health Ins.*, 944 F.2d 752, 756 (10th Cir. 1991).

This is not the first time that CIGNA, one of the defendants in the present action, raised this issue in the context of state-law claims sought to be maintained by in-network providers.  The precise argument was raised, and rejected, by Judge Moreno in *In re Managed Care Litig.*, who reasoned that: (1) "state law claims brought by health care providers against plan insurers too tenuously affect ERISA plans to be preempted by the Act," citing *Lordmann*, 32 F.3d at 1533, and *Memorial Hosp. Sys.*, 904 F.2d 236; (2) actions brought by provider plaintiffs in their independent capacity rather than as a patient's assignee are not claims for ERISA benefits, citing *Variety Children's Hosp., Inc. v. Blue Cross/Blue Shield*, 942 F. Supp. 562, 568 (S.D. Fla. 1996); (3) claims that insurers' breached their contracts by bundling and downcoding did not require plan interpretation so as to "relate to" any ERISA plan; (4) preemption of such claims would defeat rather

42

than promote the interests of ERISA; and (5) since ERISA does not provide a cause of action for health care providers, preemption would leave them with no remedy. *In re Managed Care Litig.*, 135 F. Supp. 2d at 1268.

The same is true here. The Individual Plaintiffs' claims are for payment for services, not for ERISA benefits. The dispute is not whether the services rendered by the Individual Plaintiffs to Defendants' insureds are covered under their plans but whether Defendants may reduce and deny payment based on bundling and downcoding.[17] Moreover, preemption would provide Plaintiffs with no viable remedy. Since, as dental providers with express contracts with Defendant insurers, they receive no assignment of benefits, and therefore have no standing to maintain an action under ERISA.[18]

_____

[17] Defendants also contend that Plaintiffs "cannot pursue ERISA-regulated claims when they have failed to allege the exhaustion of all administrative remedies under their patients' underlying ERISA benefit plans." However, in addition to the fact that, as in-network providers, the Individual Plaintiffs have no ERISA claim, Defendants' citations are inapposite because they each involve a suit brought directly by a plan participant or beneficiary in an ERISA plan, not an in-network provider. *Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309 (11th Cir. 2000) (employee member of ERISA plan); *Springer v. Wal-Mart Assocs. Group Health Plan*, 908 F.2d 897 (11th Cir. 1990) (same); *Byrd v. Mac-Papers*, 961 F.2d 157 (11th Cir. 1992) (ERISA beneficiary); *Harrison v. United Mine Workers 1974 Ben. Plan & Trust*, 941 F.2d 1190 (11th Cir. 1991) (retiree member of ERISA plan). *Mason v. Continental Group*, 763 F.2d 1219 (11th Cir. 1985), *cert. denied*, 474 U.S. 1097 (1986), involved a non-plan based ERISA violation by a former employee.

[18] Contrary to Defendants' misrepresentation, ¶ 128 of the Complaint does not state that Plaintiffs bring dental benefit claims as assignees. Indeed, as in-network providers, there is no claim for dental benefits that the Individual Plaintiffs could be assigned and, conversely, since in-network providers cannot balance-bill their patients, there is no claim for dental benefits any of their patients may have under ERISA. Paragraph 127 states that "[t]o the extent state prompt pay statutes afford the right to prompt payment directly to health care providers, Plaintiffs bring this claim in their own right." Paragraph 128 merely states, in the alternative, that "[t]o the extent" that prompt pay statutes afford the right to bring action to patients, Plaintiffs seek such relief as the assignee of their patient's rights.

## VIII. PLAINTIFFS' CLAIMS FOR CONSTRUCTIVE CONTRACT AND UNJUST ENRICHMENT ARE NOT PRECLUDED

Defendants assert that Court VI of the Amended Complaint (Constructive Contract and Unjust Enrichment) should be dismissed because of the existence of express provider contracts. This argument fails because Plaintiffs are entitled under Fed. R. Civ. P 8(e)(2) to plead alternative theories of recovery.

In *Thunderwave, Inc. v. Carnival Corporation*, 954 F. Supp. 1562, 1566 (S.D. Fla. 1997), the court specifically recognized that a party is permitted to alternatively plead claims of contract and unjust enrichment, and in doing so, quoted the Florida Supreme Court as follows:

> It has become quite customary, in an abundance of caution, to join the common counts [*i.e.*, unjust enrichment] with the special count which declares on the express contract, so that, if for any reason the plaintiff fails in his proof of the express contract, he may have an opportunity to at least recover the value of the work actually done or the materials actually furnished, or so much thereof as have not been paid for, upon an implied contract. *Hazen v. Cobb-Vaughn Motor Co.,* 96 Fla. 151, 117 So. 853 (1928).

The foregoing is consistent with explicit provisions of Rule 8(e)(2), that permits a party to plead alternative claims for relief. *Id.*

Defendants' motion is therefore premature. Plaintiffs may plead under an implied agreement or constructive contract to pay theory. *See, e.g., H.J. Tucker & Assocs., Inc. v. Allied Chucker and Engineering* Co., 595 N.W. 2d 176 (Mich. App. Ct. 1999), *appeal denied*, 607 N.W.2d 722 (Mich. 2000). Given that the provider agreements do not explicitly address bundling and downcoding, Plaintiffs should not be forced, at this time, to elect to proceed under one particular theory. *See Miles v. Tennessee River Pulp and Paper Co.,* 862 F.2d 1525 (11th Cir. 1989) (an

44

implied contract theory can be maintained even where there is an enforceable express contract between the parties, so long as the express contract is not on the "specific" subject of the implied agreement). Defendants' failure to fully, fairly and promptly compensate Plaintiffs for services performed results in an unjust enrichment to them.

Indeed, this was the result upheld in *In re Managed Care Litig.*, 135 F. Supp. 2d at 1269, in which the court, in addition to invoking Rule 8(e)(2), noted that "there may be matters of dispute which are outside the scope of the contracts," and refused to "attempt to adjudicate in a legal vacuum." The same caveat is appropriate here.

## IX.   PLAINTIFFS ADEQUATELY ALLEGE CLAIMS UNDER STATE PROMPT-PAY PROVISIONS

Defendants seek to dismiss Count VII of the Complaint for violations of state prompt-pay statutes. With respect to Illinois, they contend that 215 Ill. Comp. Stat. 5/154.5 does not permit a private right of action. But it does. *See Ford Motor Credit Co. v. Manzo*, 554 N.E.2d 480 (Ill. App. 1990).[19] Defendants similarly state that 215 Ill. Comp. Stat. 5/357.9 also does not permit a private right of action. Yet it does as well. *See Billings v. Continental Cas. Co.*, 2003 U.S. Dist. LEXIS 796 (N.D. Ill. Jan. 15, 2003). Defendants also ignore 215 Ill. Comp. Stat. 5/155, which provides a private right of action for an insurer's unreasonable delay in settling a claim.

In addition, whether a private right of action concerning other statutory provisions may be implied depends upon legislative intent. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) ("[T]he failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available. Such an intent

_____

[19] There is no private right of action under 215 Ill. Comp. Stat. 5/154.6(d) only, which Defendants impermissibly seek to join with the remainder of the statutory provisions.

may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment."); *Cort v. Ash*, 422 U.S. 66 (1975).

In Illinois, 215 Ill. Comp. Stat. 5/368a is entitled "Timely Payment for Health Care Services." In Nebraska, the Unfair Insurance Claim Settlement Practices Act, Neb. Stat. § 44-1540(3)-(4) enjoins an insurer's failure to implement reasonable standards for the prompt settlement of claims. An analysis of the laws at issue here demonstrates that the legislatures implicitly intended to permit dental providers to bring civil claims under these statutes. Permitting private actions under these provisions is entirely consistent with and does not impair in any way the legislative policy embodied in these statutes.

Defendants argue that the Illinois and Nebraska insurance commissioners have powers to enforce the terms of their insurance codes. It does not follow, however, that the existence of these enforcement powers makes it unlikely that the legislatures intended to give those directly affected by insurer misconduct a method for protecting their own rights. For example, even the most active insurance commissioner could not possibly have the time and resources to obtain all provider reimbursements and determine if payments are timely, calculate the amount of unpaid interest on late claims, and take legal action on behalf of individual providers to recover unpaid interest. There is nothing inconsistent about permitting both insurance commissioners and providers to enforce these statutes. Accordingly, Defendants' contention that there are no private rights of action under the Illinois and Nebraska statutes at issue should be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'
motion to dismiss in its entirety.

Dated:   New York, New York
            November 7, 2003

Stanley M. Grossman (SG-4544)
D. Brian Hufford (DH-7181) *Admitted Pro Hac Vice*
Robert J. Axelrod (RA-1696) *Admitted Pro Hac Vice*
Donald J. Davis (DD-3282)
POMERANTZ HAUDEK BLOCK
    GROSSMAN & GROSS LLP
100 Park Avenue 26th floor
New York, New York 10017
(212) 661-1100

David J. Halberg
DAVID J. HALBERG, PA
Two Datran Center, Suite 1703
9130 S. Dadeland Blvd.
Miami, Florida 33156
(305) 670-8333

Jonathan W. Cuneo
CUNEO, WALDMAN & GILBERT, LLP
317 Massachusetts Avenue NE, Suite 300
Washington, DC 20002
(202) 789-3960

Jonathan L. Alpert
THE ALPERT LAW FIRM
Suntrust Center, Suite 1825
401 E. Jackson Street
Tampa, Florida 33601
(202) 789-3960

47

Jeffrey M. Liggio
LIGGIO, BENRUBI & WILLIAMS, PA
1615 Forum Place, Suite 3B
West Palm Beach, Florida 33401
(561) 616-3333

*Counsel for Plaintiffs*

AMERICAN DENTAL ASSOCIATION
Peter M. Sfikas
Brent D. Hanfling
211 East Chicago Avenue
Chicago, Illinois 60611
(313) 440-2500

*Of Counsel*

48

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

THE AMERICAN DENTAL ASSOCIATION, in
an associational capacity on behalf of its
members, and JOHN MILGRAM, D.D.S., and
SCOTT A TRAPP, D.D.S, individually and on
behalf of all others similarly situated,

          Plaintiffs,

   v.

CIGNA CORPORATION, CONNECTICUT
GENERAL LIFE INSURANCE COMPANY,
CIGNA DENTAL HEALTH, INC.,  METLIFE,
INC., METROPOLITAN LIFE INSURANCE
COMPANY, and MUTUAL OF OMAHA
INSURANCE COMPANY,

          Defendants.

Case No.: 03-21266-CIV-JORDAN
Magistrate Judge Turnoff

**<u>CERTIFICATE OF SERVICE</u>**

    The undersigned, an attorney duly admitted to practice before the courts of New
York, certifies that on November 7, 2003, I served true and correct copies of:

    1.   Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint
        Motion to Dismiss;

    2.   Plaintiffs' Memorandum of Law in Opposition to Defendant CIGNA's
        Motion To Compel Arbitration And to Dismiss Claims or Stay
        Proceedings Pending Arbitration; and

    3.   Compendium of Unpublished Authorities

upon the following:

John G. Harkins, Jr., Esq.
Eleanor Morris Illoway, Esq.
Marianne Consentino, Esq.
Barbara Brigham Denys, Esq.
Colleen Healy Simpson, Esq.
HARKINS CUNNINGHAM
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042

Edward F. Mannino, Esq.
David L. Comerford, Esq.
AKIN GUMP STRAUSS HAUER
  & FELD, LLP
2005 Market Street, Suite 2200
Philadelphia, PA 19103

David A. Bono, Esq.
HARKINS CUNNINGHAM
801 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004-2615

Marty L. Steinberg, Esq.
Edward Gonzalez, Esq.
Samuel A. Danon, Esq.
HUNTON & WILLIAMS
Mellon Financial Center
1111 Brickell Avenue, Suite 2500
Miami, FL 33131-3136

Craig P. Kalil, Esq.
ABALLI, MILNE, KALIL
  & ESCAGEDO, PA
2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131

Hilarie Bass, Esq.
Mark P. Schnapp, Esq.
Christine M. Nanfeldt, Esq.
GREENBERG TRAURIG, PA
1221 Brickell Avenue
Miami, FL 33131

by depositing same enclosed in post-paid wrappers, in an official depository under the exclusive care and custody of the U.S. Postal Service within this State.

_____
Susan J. Weiswasser

2